UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN NERAYOFF, | Case No. 1:25-cv-02012-PKC-JAM |
| Plaintiff, | |
| -against- | **AMENDED VERIFIED COMPLAINT** |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

Plaintiff STEVEN NERAYOFF ("Plaintiff" or "Mr. Nerayoff"), alleges as follows:

## NATURE OF THE ACTION

1.     This action seeks damages from the United States Government for its malicious prosecution of Plaintiff for alleged violations of the Hobbs Act allegedly committed by Plaintiff against a Seattle based tech company and two of its executives (described in the charging document as "Company 1", "John Doe" and "Jane Doe"), which the United States and its law enforcement officers knew — from evidence they possessed — had not occurred.

2.     This malicious prosecution was eventually dismissed with prejudice by the Court, on the Government's own motion, which however was only made three and one-half years into the case and only after Mr. Nerayoff himself moved to dismiss the criminal complaint or, in the alternative, unseal the grand jury minutes. As a result of his arrest and this malicious prosecution, Mr. Nerayoff lost hundreds of millions of dollars in contracts he had already been awarded, future losses estimated in the billions of dollars, pain and suffering, and public humiliation.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331, § 1367(a) as well as § 1343(a)(3) and 4. This action arises in part under the Federal Torts

1

Claims Act (FTCA) (28 U.S.C. § 2671 et. seq., and 28 U.S.C. § 1346 and § 1335.

4.       Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1402(b), as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

5.       On April 10, 2024 Mr. Nerayoff, through counsel, submitted an administrative claim on Standard Form 95 to the FBI and the Department of Justice under the Federal Tort Claims Act.

6.       Neither the FBI nor the Department of Justice responded to the claim within six months and, as such, it was deemed denied on October 10, 2024. 28 U.S.C. § 2675(a).

## THE PARTIES

7.       Plaintiff Steven Nerayoff is a natural person who, at the time of the commencement of this action, resided in Great Neck, New York.

8.       Defendant United States of America was at all times material to this complaint the employer of Jordan Anderson (hereinafter "S/A Anderson"), employed as a Special Agent of the Federal Bureau of Investigation as a law enforcement officer and acting within the scope of his duties.

9.       As such, the United States is an appropriate defendant under the Federal Torts Claims Act for the conduct of its employee Anderson.

## STATEMENT OF FACTS

10.      Steven Nerayoff is an attorney, inventor and the founder and Chief Executive Officer ("CEO") of Alchemist Creations, LLC ("Alchemist"), a consultancy, accelerator and investment firm for high-potential blockchain companies and of Maple Ventures LLC ("MV"). Mr. Nerayoff holds 46 U.S. and international patents, primarily in the field of artificial intelligence,

autonomous vehicles, and Smart Cities. Mr. Nerayoff is the inventor of the "Utility Token" and a structured method for selling these new digital assets to the public in what became known as the "Initial Coin Offering" ("ICO") while at Ethereum, the "Security Token" or "Tokenization" and Security Token Offering ("STO") while at tZERO.

11.     The creation of the Utility Token and ICO by Mr. Nerayoff created a legal and economic "force field" around Crypto when it was embryonic and allowed it to flourish outside of the traditional financial and monetary systems by constructing a method whereby tens of billions of dollars were raised by Crypto Projects. Mr. Nerayoff's innovation around security tokens or tokenization allowed for the democratization of capital and unleashed trillions of dollars in trapped wealth potentially without the involvement of Wall Street.

12.     Mr. Nerayoff's work with the Ethereum blockchain, which resulted in his invention of the Utility Token and ICO, has been publicly acknowledged in Camila Russo's *The Infinite Machine* and Laura Shin's *The Cryptonians*.

13.     Beginning in or around 2017 or 2018, federal agents, including but not limited to, FBI Special Agents Jordan Anderson and Andrew Cropcho, and officers from the DOJ and SEC, began a collective and concerted fishing expedition into Mr. Nerayoff's business dealings that included, among other things, the issuance of subpoenas (investigative and/or grand jury), and surveillance by government informants who were known criminals.

14.     This campaign revealed to federal agents and officers that Mr. Nerayoff was engaged in nothing but legitimate, well-documented business dealings and negotiations, including with Storm X and its chief operating officer Arry Yu and chief executive officer Simon Yu (whom the Government in charging documents anonymized as "Company 1", "John Doe" and "Jane Doe"), between 2017 and 2018.

15. Indeed, on or before February 2019, the federal Government had in its possession, custody, and control all the communications between Mr. Nerayoff and "Company 1" that revealed routine business transactions and negotiations that were extraordinarily cordial, and reflected that Mr. Nerayoff did not engage in, or demonstrate any extortionary behavior that could violate the Hobbs Act.

**S/A Anderson Makes Multiple False Sworn Statements in a
Criminal Complaint and Affidavit Four Months Before a Grand Jury Is Convened**

16. On September 17, 2019, months before a Grand Jury was convened, and despite not having any evidence of criminal behavior, S/A Anderson perjured himself in a sworn affidavit to support a criminal complaint (collectively, the "Affidavit") and arrest warrant for Mr. Nerayoff.

17. In his Affidavit, S/A Anderson knowingly withheld information, and mischaracterized the evidence in the Government's possession in order to fabricate the false narrative that Mr. Nerayoff's business dealings with Company 1 were the result of Mr. Nerayoff using coercive, extortionary threats of violence, physical and/or economic harm. Indeed, this simply was not the case.

18. S/A Anderson's Affidavit in support of the arrest warrant was a collection of lies, misstatements, and half-truths that were assembled in order to create the illusion of probable cause to mislead the United States District Court to issue a warrant for the arrest of an innocent man for a crime that S/A Anderson created.

19. At the outset, Anderson misled the court by falsely describing the nature of Mr. Nerayoff's relationship with Michael Hlady, his alleged co-conspirator in the fictitious extortion scheme against Company 1.

20. However, when on September 17, 2019, S/A Anderson swore out his affidavit, he knew that Hlady had defrauded Mr. Nerayoff of nearly a million dollars by pretending to be

"Michael Peters," a retired government agent employed by North Star Ventures, a consulting agency, as Mr. Nerayoff had reported this crime to Anderson in June of 2019—a crime that Anderson did not act on.

21.     Moreover, during the time Anderson alleged Mr. Nerayoff was conspiring to commit extortion with Hlady, Anderson had been in extensive communication with Hlady—the two engaging in 100 text messages and 45 telephone calls.

22.     Anderson also falsely swore, "[a]fter MV and Company 1 signed the [July 22, 2017] agreement, the defendants STEVEN NERAYOFF and MICHAEL HLADY took various actions to threaten John Doe, Jane Doe and Company 1 in order to extract additional compensation without promising or rendering any additional services, as detailed below."

23.     That Mr. Nerayoff and Company 1 mutually agreed on September 10, 2017 that their initial agreement had to be renegotiated was known to the Government as early as February of 2019 when Company 1 provided the Government with a copy of Jane Doe's September 10, 2017 email to Mr. Nerayoff.

24.     Also, that same day, September 10, 2017, Jane Doe drafted herself an email, the subject "[Jane Doe] WILL DELETE THIS AFTER THE CALL FYI,", which appear to be her notes for the September 10, 2017 Skype Meeting the parties held that day. Ms. Doe's notes confirm that the parties had to rework the July 27, 2017 agreement because their mutual misunderstanding had resulted in "numbers [being] very, very, very, very, very off." Her notes also included "Alchemist got us a crazy advisor board," and "[w]hatever number they come back with, go back to David and ask to help negotiate a better deal. David can talk to Steven…"

25.     S/A Anderson also swore:"[o]n or about and between October 30, 2017 and November 6, 2017, the defendant STEVEN NERAYOFF and a co-conspirator ("Co-Conspirator

1") contacted John Doe and Jane Doe and demanded that Company 1 agree to let MV keep 30,000 ETH (worth approximately $8.75 million on November 7, 2017) that it had been holding from the pre-sales. NERAYOFF stated, in sum and substance, that if John Doe and Jane Doe did not agree, then NERAYOFF would, among other things, sabotage the crowdsale, generate negative press for Company 1 and use his contacts with influential people to "destroy" Company 1. NERAYOFF told John Doe, in sum and substance, that John Doe had a choice: NERAYOFF could keep all the pre-sale funds raised and destroy Company 1, or Company 1 could sign two agreements that he sent."

26.     But S/A Anderson's Affidavit failed to calculate or disclose the actual value of the StormX tokens contractually owed to Mr. Nerayoff, despite listing the number of tokens due and the Government then possessing all supporting records. Had S/A Anderson provided that calculation to the Court, it would have established that Mr. Nerayoff had a claim of right to millions of dollars' worth of StormX tokens, in excess of the ETH S/A Anderson alleged was extorted.

27.     In all events, S/A Anderson's sworn allegation that Mr. Nerayoff had made threats to Company 1 and its representatives was another absolute lie by S/A Anderson, as the emails leading up to the November 6, 2017 agreement, which were in the possession of the Government at least seven months prior to S/A Anderson's sworn complaint, clearly establish the original July 22, 2017 agreement was voided because of a mutual misunderstanding.

28.     Indeed, while the complaint accused Mr. Nerayoff of threatening to "sabotage the crowdsale, generate negative press for Company 1 and use his influential people to 'destroy' Company 1," Mr. Nerayoff did no such thing. The Government failed to produce a single threat by Mr. Nerayoff against Jane Doe, John Doe and Company 1, because no such thing existed.

29.     Indeed, the facts are quite the opposite as Mr. Nerayoff had consistently sought to

aid Company 1 in a successful crowdsale and the Government was well aware of this.

30.     The Government also knew that John Doe had told Mr. Nerayoff that he thought 30,000 Ether as part of Mr. Nerayoff's compensation was fair as it was contained in an email that Mr. Doe sent Nerayoff that had been provided to the Government seven months prior to Anderson's perjurious affidavit in support of the arrest warrant.

31.     S/A Anderson also falsely swore: "[a]t the conclusion of Company 1's crowdsale, 1.3 billion of Company 1's tokens still remained unsold. On approximately December 1, 2017, Company 1 incentivized users of Company 1 tokens and participants in the crowdsale to retain the Company 1 tokens by promising to distribute any unsold tokens to them. Despite not being eligible to receive these tokens, between approximately December 2017 and May 2018, the defendant STEVEN NERAYOFF demanded 1 billion of the unsold tokens from Company 1, before revising his demand to 350 million tokens."

32.     This too was another lie. In fact, the Government had in its possession, since at least February 2019, the text messages that not only proved Mr. Nerayoff did not demand 1 billion tokens, but that Jane Doe and John Doe wouldn't allow all of Mr. Nerayoff's tokens to be included in the Loyalty Program like every other token holder. The irony is that it was Mr. Nerayoff who was disadvantaged and not treated like every other token holder due to Jane Doe's and John Doe's refusal to do so and the Government knew this.

33.     S/A Anderson also swore: "[i]n approximately March 2018, the defendant STEVEN NERAYOFF demanded that Company 1 give him a purported loan for 10,000 ETH (valued at approximately $4.45 million on March 28, 2018). Around that same time, NERAYOFF introduced the defendant MICHAEL HLADY to John Doe and Jane Doe.

34.     NERAYOFF stated, in sum and substance, that HLADY was his "operations guy,"

whom they should view as the president of Alchemist. NERAYOFF also told John Doe and Jane Doe that HLADY was a former government agent who could carry firearms through airports. On separate occasions, HLADY told Jane Doe, in sum and substance, and among other things, that he had been shot at and had killed people, that he had "taken down" a head of state, and that he had been a part of the Irish Republican Army, the National Security Agency, the Central Intelligence Agency and the Federal Bureau of Investigation. The email address from which HLADY would email John Doe and Jane Doe had an Alchemist domain."

35. The Government knew from Company 1's own records, provided to the Government in February of 2019, that Mr. Nerayoff did not demand a loan from Company 1, rather John Doe and Jane Doe offered to 'loan' Mr. Nerayoff the 10,000 ETH as a way to provide him with some value for the 2.25 billion tokens (plus his percentage of loyalty tokens), that he was then entitled to, which Company 1 was holding hostage in Company 1's public wallet while never disclosing that they belonged to anyone other than Company 1.

36. With regard to the statements that "Peters" made to Jane Doe about being shot at and killing people in government service, these statements appear consistent with Hlady's con, which S/A Anderson knew about. The only discussion involving people being killed occurred, when "Peters" in a staged November 21, 2018 recorded call with Jane Doe supervised by Seattle FBI Office Special Agent Andrew Cropcho, awkwardly started the conversation off by saying one of his teammates had been killed. This "threat" was made by Hlady after everyone, Jane Doe, the FBI and even Mr. Nerayoff, knew that Hlady was a total fraud—he was not decorated former federal agent Michael Peters, he was convicted felon Michael Hlady.

37. Agent Anderson similarly misled the Court by altering details regarding how and when Hlady, whom Anderson cast as Mr. Nerayoff's enforcer—despite all evidence to the

contrary—met John Doe and Jane Doe. Mr. Nerayoff did not introduce "Peters" to Jane Doe and John Doe in early March around the time the Government claimed Mr. Nerayoff was allegedly extorting them, rather Jane Doe and John Doe had met "Peters" in mid-February 2018 at a conference that they attended with Mr. Nerayoff in Fort Lauderdale, Florida.

38.     S/A Anderson also took innocuous facts and wove them into his extortion conspiracy narrative while concealing facts that completely eviscerated the extortion narrative. That "Peters" received an Alchemist email account although he was only a consultant is not exceptional—and S/A Anderson knew that, as upon her request both Jane Doe and John Doe were also given Alchemist email addresses as the parties had been discussing Alchemist's acquisition of Company 1. The Government knew as much as early as February of 2019 when it received a copy of an email John Doe sent to Mr. Nerayoff in which he confirmed he had received his Alchemist email. Jane Doe was also given an Alchemist corporate credit card to use in anticipation of her coming to work for Alchemist either directly for Alchemist or through Alchemist's acquisition of Company 1. Also in March of 2018, John Doe was invited to join Alchemist's "daily stand-up meetings" as part of the Alchemist team. Of course, those facts were omitted from Anderson's affidavit as they were inconsistent with the false extortion narrative he weaved.

39.     S/A Anderson also swore: "[b]etween March 20, 2018 and March 23, 2018, both dates being approximate and inclusive, Jane Doe visited the defendants STEVEN NERAYOFF and MICHAEL HLADY at NERAYOFF's home in Great Neck, New York. Due to a snowstorm, Jane Doe was unable to depart New York on a flight as scheduled. Instead, Jane Doe stayed at NERAYOFF's house on the evening of March 21, 2018, and through March 22, 2018."

40.     The fact that Jane Doe visited Mr. Nerayoff and it snowed is true, but what the affidavit omits is that Jane Doe came to Great Neck to house hunt as it was her stated desire to

move to the same town that Mr. Nerayoff lived in and Alchemist was headquartered in, to work for Alchemist whether Company 1 was acquired by Mr. Nerayoff or not. Facts also known to Anderson which didn't fit into Anderson's false extortion narrative.

41.     S/A Anderson further swore: "[i]n the middle of the night, on approximately March 22, 2018, the defendant MICHAEL HLADY walked into the room where Jane Doe was sleeping by herself. HLADY turned on the lights, pulled a up a chair to the bed where Jane Doe had been sleeping and told Jane Doe, in sum and substance, that if Company 1 did not agree to his demands, which included, among other things, a demand for $10,000,000 and a large amount of Company 1 tokens, then "we will crush you," by, among other things, driving down the price of Company 1's tokens. At some point later that night, the defendant STEVEN NERAYOFF also entered the room. He told Jane Doe, in sum and substance, that he would destroy her and Company 1, but that he did not want to, and asked Jane Doe if she wanted to, in sum and substance, thrive or be destroyed. Shortly thereafter, NERAYOFF and HLADY demanded that Company 1 provide a purported 10,000 ETH loan to NERAYOFF."

42.     This too simply did not happen, as Anderson knew that Jane Doe, who had emailed Special Agent Andrew Cropcho in June of 2018, had made no such claim. The entire "bedroom extortion" scene, including the allegation that Hlady "pulled a chair up" to deliver the allegedly extortionate threat to Jane Doe, was a work of fiction eerily similar to the conduct charged as part of a Hobbs Act extortion in *United States v. Orlando*, 819 F.3d 1016, 1020 (7th Cir. 2016) and again part of the false extortion narrative that Anderson crafted.

43.     S/A Anderson also swore: "[o]n other occasions, the defendants STEVEN NERAYOFF and MICHAEL HLADY made additional threats to Jane Doe and John Doe. For example, HLADY told Jane Doe he was aware of her work-related issues at a different company

and knew where her child went to school. NERAYOFF and HLADY also threatened to expose Company 1 to potential litigation."

44.     When Anderson swore these facts he knew that was a valid legal dispute between Mr. Nerayoff and Company 1, threatening to expose Company 1 to litigation in connection with that dispute was no crime. Anderson also twisted the fact that Mr. Nerayoff and Hlady knew where Jane Doe's child went to school as the Government knew that Jane Doe had shared a picture of her child with them and that Jane Doe, John Doe, Mr., Nerayoff and Hlady had spent a week together socializing on a business trip to Korea in April of 2018, mere days after the alleged March extortion.

45.     S/A Anderson further swore: "[b]etween approximately March 27, 2018 and March 28, 2018, as the defendant MICHAEL HLADY was moving through John F. Kennedy International Airport to fly to Cancun, Mexico, HLADY sent a series of "iMessages" to Jane Doe primarily regarding the loan. One of the messages that HLADY sent to Jane Doe said the following, in sum and substance: "Jane Doe fix this by the time I land or I promise I will destroy your community. (1) we will go public with Stevens holding. (2) we will sell and get everyone we know to sell. (3) we will sue you. (4) a story will be written about Company 1. You are stalling for stalling's sake. I will be landing in 4hrs I expect you and John Doe on the phone. Also I want the "manual" you wrote today!!"

46.     Mr. Nerayoff's threat to bring a lawsuit to assert a valid civil claim for hundreds of millions of dollars' worth of Storm X tokens was not a crime. Further, the 'threats' themselves are non-sensical — S/A Anderson knew that Mr. Nerayoff could not sell all his tokens as he had not received them yet — that was the very reason for the dispute between Mr. Nerayoff and Company 1 — that Company 1 and John Doe and Jane Doe had refused to release to him Company 1 tokens

that had a value well above $100 million dollars or so at the time. Also, although unbeknownst to Hlady who came on to the scene after the crowd sale was completed, most of the sale participants that Mr. Nerayoff had brought in sold their tokens already — a fact of which Jane Doe, John Doe and S/A Anderson were well-aware.

47. S/A Anderson also swore "[a]s a direct result of these threats, on or about and between March 28, 2018 and April 1, 2018, John Doe instructed a Company 1 employee to transfer 10,000 ETH to the defendant STEVEN NERAYOFF as a loan. Despite repeated requests in approximately May 2018 through August 2018 to NERAYOFF and the defendant STEVEN HLADY, NERAYOFF refused to pay back the 10,000 ETH loan."

48. Again, S/A Anderson misled the Court as a threat to commence litigation to assert a valid claim is of course not a crime, and in a recorded May 18, 2018 hotel meeting with Mr. Nerayoff, Hlady, John Doe and Jane Doe, Mr. Nerayoff, consistent with his March 31, 2018 email confirming the terms of the "loan," advised them to sell the tokens he had provided as collateral to satisfy the debt — thus satisfying the terms of the loan. All of this was known by S/A Anderson.

49. S/A Anderson's affidavit similarly strung together several "Other Threats," which were equally untrue or at minimum misleading — Anderson swearing: "[t]he defendant STEVEN NERAYOFF also made clear to Jane Doe that he wanted to acquire Company 1. On or about May 10, 2018, NERAYOFF wrote an email to HLADY and Co-Conspirator 1, which stated in part: Something has to be done to explain when they [i.e., Jane Doe and John Doe] make a deal they stick to it regardless of the consequences. And then when we renegotiate they stick to that deal. Enough is enough. We are acquiring them and going to make them fucking rich as hell and she [i.e., Jane Doe] will pay off everything and get what she would never have without us so tell her to chill out. We will blow them out as a protocol and they will be part of Alchemist."

50.     S/A Anderson's inclusion of this information warped what actually was going on as the actual email that Agent Anderson alleged to recount to the court was not sent to Jane Doe. S/A Anderson also failed to disclose to the issuing magistrate that Mr. Nerayoff was indeed looking to acquire Storm X in a lawful arms-length transaction and that in anticipation of the acquisition, and upon their request, both Jane Doe and John Doe had been given @alchemist.com email addresses, Jane Doe had received an Alchemist credit card and John Doe was invited to attend weekly Alchemist video meetings, and not insignificantly, that Mr. Nerayoff has not received a single token that he was lawfully entitled to.

51.     S/A Anderson misled the issuing Magistrate by omitting the entirety of the email which put it in context. Context that would have shown that the parties were working on a mutually beneficial merger which would make both Jane Doe and John Doe "rich as hell" and that Jane Doe, whom Anderson claimed was to be threatened by it was not on the email at all.

52.     The full email which Mr. Nerayoff sent to "Peters" and cc'd Mr. Nerayoff's then partner, whom Anderson identified as "Co-Conspirator 1," read: "She is beyond pissing me off. I invited her and Simon to a very elite thing we are sponsoring and nothing back. This was in response to a weird text from here. Something has to be done to explain when they make a deal they stick to it regardless of the consequences. And then when we renegotiate they stick to that deal. Enough is enough. We are acquiring them and going to make them fucking rich as hell and she will pay off everything and get what she would never have without us so tell her to chill out. We will blow them out as a protocol and they will be part of Alchemist. And we have to decide if Simon is helping on deals. We really need to all four of us sit down and come to an understanding. This doesn't change any of the old stuff (mind you I have not received a single token they are holding everything other than what I actually paid for like everyone else). Let's set a time to discuss

with them. It may turn out that we acquire them but she refuses to help Alchemist. Would be a bad decision on her behalf because she can make a lot of money but we have to move on if that's the case and she can stay focused on [Company 1] which isn't the worst thing in the world if we are turning them into a protocol. Her and [John Doe] can promote that and be heros[sic]."

53.     S/A Anderson further swore:"[o]n approximately May 15, 2018, Simon Yu and Arry Yu attended a meeting in a hotel room in New York City, with the defendants STEVEN NERAYOFF and MICHAEL HLADY, along with Co-Conspirator 1 and other individuals working for NERAYOFF. During the meeting: (1) NERAYOFF confirmed that he knew of HLADY's threat to "destroy" Company 1; and (2) one of NERAYOFF's employees stated that they were running an "intervention" with NERAYOFF, and that with exception of NERAYOFF, they were not "ganging up" on Jane Doe and John Doe."

54.     S/A Anderson's statement grossly distorts what actually was recorded by the FBI at the meeting — a recording S/A Cropcho had received from Jane Doe in June of 2018. In that recording, Mr. Nerayoff can be plainly heard stating that he was not and had not threatened Jane Doe and John Doe, but that he knew that Hlady had threatened them, a reference to the March text. Anderson however knew in the spring of 2019 that Mr. Nerayoff found out about the threats after Hlady had sent them, and S/A Anderson's account omits that Mr. Nerayoff, consistent with the March 2018 agreement, told Jane Doe and John Doe to sell the tokens he had pledged as collateral for the 10,000 ETH thus satisfying the terms of the "loan."

55.     S/A Anderson further swore that Mr. Nerayoff wanted to acquire Company 1 through force, as it was included in the facts supporting the Hobbs Act Conspiracy charge. This too was a lie, as the recordings provided by the Government in discovery in the criminal case against Mr. Nerayoff established that the last time Mr. Nerayoff had spoken with Jane Doe prior

to November 21, 2018, a call both he and S/A Cropcho recorded, was at the May 18, 2018 Hotel Room meeting. During the November 21, 2018 recorded call Mr. Nerayoff asked Jane Doe about the contacts that Hlady had with Company 1, particularly regarding Alchemist's acquisition of Company 1 as he was unaware of what Hlady had been doing for the past six months.

56.     Based on his perjured statements, and knowing there was no actual probable cause for it and it was legally and factually baseless, Special Agent Anderson and other federal agents and/or officers secured an arrest warrant for Mr. Nerayoff on September 17, 2019 from the Hon. Ramon E. Reyes, Jr., United States Magistrate Judge, Eastern District New York.

57.     Early on the morning of September 19, 2019, at least a dozen federal agents arrived at, and entered, Mr. Nerayoff's residence in bulletproof vests, with firearms drawn. Mr. Nerayoff, who at that time was in his bed, sleeping, and recovering from shoulder surgery with bandages and a rod attached to his arm, was taken aback by the bruhaha.

58.     The federal agents, including Special Agent Anderson, barged into Mr. Nerayoff's room, and physically lifted him out of his bed despite his obvious injuries. Other federal agents began rummaging through his residence opening drawers and cabinets throughout the residence, even though there was never a search warrant issued for the search of Mr. Nerayoff's home or his electronic devices.

59.     Special Agent Anderson placed handcuffs on Mr. Nerayoff and while he was restrained, repeatedly tried to coerce Mr. Nerayoff into turning over the passcode to his iPhone and holding the phone in front of Mr. Nerayoff's face to automatically unlock it. Mr. Nerayoff repeatedly refused to open the phone, or have his eyes be used against his will to unlock it. After his attempts at opening the phone were frustrated, Special Agent Anderson turned off the iPhone and placed it in his pocket.

60. Next, Special Agent Anderson and another federal agent whose identity is unknown, dragged Mr. Nerayoff, still in handcuffs, out of his residence and into an unmarked van parked on the street, where he was held and interrogated for hours. Mr. Nerayoff was never told why he was detained and dragged into a van, and he was never shown any warrant – for his arrest or the search of his iPhone or residence.

61. In the van, S/A Anderson told Mr. Nerayoff that he would not see his young minor children grow old if he did not cooperate with the agents in the van and provide them with information about the individuals whose names were listed on a piece of paper that the federal agent was holding. Mr. Nerayoff recognized the long list of names as belonging to some of the most notable players in the cryptocurrency community.

62. S/A Anderson was not specific about the information he wanted from Mr. Nerayoff and wanted "anything" about "anyone" who was listed on the piece of paper. Mr. Nerayoff repeatedly refused to provide any such information for the hours he was in the van. In the meantime, S/A Anderson kept threatening Mr. Nerayoff with a long prison sentence and inability to see his kids until they were adults. Mr. Nerayoff was disoriented and terrified because what he was experiencing seemed more like a terrorist hostage situation than any sort of lawful arrest. After several hours, Mr. Nerayoff was then taken to an FBI office that seemed to be connected through an underground tunnel to the federal courthouse in Brooklyn. After sitting in the FBI office and being questioned, he was taken to a holding cell, and into a federal courtroom for an arraignment, and released on a $750,000 bond, forced to surrender his passport, subject to travel restrictions and supervision by Pretrial Services.

63. As a result of his arrest and malicious prosecution, Mr. Nerayoff lost several hundred million dollars of contracts in crypto space, lost ability to conduct business, was publicly

branded an extortionist, inability to obtain capital, etc.

**A Grand Jury Is Convened and an Indictment Is Issued Based on S/A Anderson's Perjury**

64.     That malicious prosecution continued when prosecutors from the Eastern District of New York assisted by attorneys of the SEC convened a grand jury and obtained an indictment on January 10, 2020 based on the very same lies that S/A Anderson had advanced in his September 17, 2019 Affidavit.

**The Government Moves to Dismiss the Criminal Case With Prejudice, But Only in Response to and After Mr. Nerayoff  Moves to Dismiss or, in the Alternative, to Unseal the Grand Jury Minutes**

65.     Ultimately, in March of 2023, the Government moved to dismiss all charges against Mr. Nerayoff with prejudice, but the Government only did this after and in response to a motion by Mr. Nerayoff to dismiss the criminal complaint with prejudice or, in the alternative, to unseal the grand jury minutes. That is, the Government's motion to dismiss was only made after Mr. Nerayoff's attorney presented the Government with incontrovertible evidence of his innocence — in the form of a motion to dismiss — which included emails, messages and documents which were in the Government's possession at least seven months before his arrest.

66.     On May 5, 2023, the Hon. Margo Brodie, United States District Court Judge for the Eastern District of New York, dismissed all charges against Mr. Nerayoff with prejudice.

67.     On April 10, 2024, Mr. Nerayoff caused a claim under the Federal Tort Claims Act with attachments to be mailed to The Department of Justice Civil Division and Federal Bureau of Investigation via United States Priority Mail.

68.     More than six months have passed since those departments received the claim and there has been no action by the United States on the claim.

## AS AND FOR A CAUSE OF ACTION AGAINST THE UNITED STATES PURSUANT TO THE FTCA: MALICIOUS PROSECUTION

69.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs (1-68) as if set forth at length herein.

70.     At all relevant times S/A Anderson was an agent of the United States and acting within the scope of his duties as a law enforcement officer.

71.     The United States through S/A Anderson maliciously instituted and continued a proceeding against Plaintiff in bad faith and without probable cause.

72.     The criminal proceedings terminated against Plaintiff on May 5, 2023 when the court granted the Government's motion to dismiss all charges against Plaintiff with prejudice, which is consistent with his innocence.

73.     At all times, the United States lacked probable cause to commence and to continue the proceedings against Plaintiff since, at all relevant times, the United States, including S/A Anderson knew or possessed information that Plaintiff had committed no crimes, and that no person could evince any facts or circumstances which could lead a reasonable person to believe that Mr. Nerayoff was guilty of the crimes charged.

74.     The United States lacked probable cause to commence and to continue the criminal prosecution against Plaintiff since the September 17, 2019 arrest warrant was procured by fraud, false or misleading testimony, suppression of evidence and other law enforcement misconduct as detailed herein.

75.     The United States lacked probable cause to commence and continue the criminal prosecution against Plaintiff since the indictment which followed the September 17, 2019 arrest warrant was also procured by fraud, false or misleading testimony, suppression of evidence and other law enforcement misconduct as detailed herein.

76. S/A Anderson, at all relevant times, was motivated by actual malice in that S/A Anderson knew that Plaintiff was innocent of any criminal conduct and that there was no probable cause to believe Plaintiff had engaged in criminal conduct.

77. S/A Anderson played an active role in the prosecution of Plaintiff including advising, encouraging and importuning federal prosecutors to act, including by withholding relevant and material information from prosecutors and the court, including highly exculpatory evidence of Plaintiff's innocence both prior and subsequent to the obtaining of the arrest warrant and indictment, and by creating and providing to the prosecutors and the court false information calculated and likely to influence their actions prior and subsequent to the indictment.

78. At all relevant times, S/A Anderson's actions were motivated by bad faith, actual malice, and were not justified, excused or privileged.

79. Plaintiff suffered severe damages as a result of Defendant's misconduct including but not limited to loss of liberty, loss of income, loss of his future livelihood, economic losses including costs of his defense, reputational damages, emotional distress, and other pain and suffering.

80. The United States is liable for these damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

81. **WHEREFORE,** Plaintiff demands judgment against Defendant in compensatory and all other damages caused by Defendant's acts and omissions in at least the following categories, in amounts to be proven in detail at a trial of this action:

     a.    Lost earnings,

     b.    Value of lost contracts,

     c.    Value of future lost business,

d.      Personal suffering, emotional distress,

e.      An amount adequate to compensate Plaintiff for defense costs incurred

defending the malicious prosecution;

f.      Plaintiff further requests costs and attorney's fees;

g.      Such other further relief as this Court may deem just and proper; and

h.      Such other relief as Plaintiff may be entitled to.


Dated:  November 19, 2025                    **MEISTER SEELIG & FEIN PLLC**

                                             By: */s/ Stephen B. Meister*

                                             Stephen B. Meister
                                             Milton Otto
                                             125 Park Avenue, 7th Floor
                                             New York, New York 10017
                                             (212) 655-3500
                                             sbm@msf-law.com
                                             mo@msf-law.com

                                             *Attorneys for Plaintiff Steven Nerayoff*

## VERIFICATION

I am the plaintiff in this action. I have read the foregoing Amended Verified Complaint, and I verify under penalty of perjury under the laws of the United States of America that its factual contents are true to my personal knowledge, except as to matters alleged on information and believe, and as to those matters, I believe them to be true.

STEVEN NERAYOFF